Let's compromise $25,000. It's getting late, and we've got to get ready for another big calendar tomorrow. I understand. Let me move along. May I please quote my name? It's Bill Kayada. I'm here with my partner, Jared DeRozier, and Sean Gallagher, who you've already met. I'm making the presentation to this Court today on behalf of both petitioners in this proceeding. I'm also aware that the conversation concerning the issues in this case has already begun, and I listened to that this morning, and I will try not to repeat what went over this morning. Rather, what I'd like to do is to sharpen the focus on a few points. Before I do that, though, let me make one factual observation. That's regarding the discussion concerning a rate freeze. There was a rate freeze at the retail level in California prior to the period of time that these contracts were signed. However, none of the rates under any of these contracts are in any way frozen in terms of getting things all passed along to consumers, and that was undisputed below throughout the proceedings. Meaning that the freeze was lifted? The freeze was completely inapplicable to these rates, and here's why. When the utilities and the purchasers essentially went bankrupt and the State had to step in, the State did not have $43 million in loose change hanging around, and it needed to have some ability to buy electricity as the buyer of last resort. And so in order to do that, it enacted legislation that entitled CDWR to go out and buy electricity and made it mandatory, essentially, that rates would then get passed along directly to consumers. In fact, the rates were so large that it was literally impossible to pass them along directly, so what California did was issue bonds that would then stretch out the payment period. So all of these rates are being paid by California consumers back into DWR to pay off the bonds, which literally means that the children whose schools were losing their lights in the electricity crisis, their grandchildren will actually still be paying rates incurred by CDWR under this contract, effectively. So it's a 100% pass-through. That was undisputed below, and if you want more detail on that, I was... A national debt. Maybe we ought to move someplace else. Yes, Your Honor, although we'd have to find some place that has functioning electricity markets, which we do in Maine, by the way. The full history on that is spelled out in the PUC's decision that is cited at page 52 of the seller's brief. That's 202 California PUC, Lexis 170. That goes through the entire history. It's also in the record and cited in our brief on page 17. Now, against that background, let me return to the legal issues. And this, from the perspective of the law, this is, in the first instance, a case of statutory interpretation. And we have very clear statutory language enacted by Congress which says that all rates subject to first jurisdiction, that being wholesale rates, shall be just and reasonable. That is the starting point, I think, for any legal analysis is that statute. And that's where the Ninth Circuit panel... I don't understand Mobile Sierra's doctrine coming from in light of that. Yes. I think the fairest reading of Justice Harlan's decisions in the Mobile Sierra case is that he said that what Congress had in mind was Congress was focused on the public, not purely private, interest. And that was the distinction drawn in those two cases. In other words, if two parties between themselves want to make a contract and do so, that is essentially of no concern, with one exception regarding the initial filing, unless it affects the public. And that's all those cases... That may well be a fair reading, but it isn't necessarily what the courts have done since. Well, let me look at it, because I think... Let me put two modest propositions that I think fully allow complete reversal of what FERC has done in this case. One is that however you interpret that language and however you read Mobile Sierra, in the end, you emerge with a conclusion that there should be, and there has to be under the Federal Power Act, at least one opportunity for consumers to have FERC make the basic Federal Power Act determination as to whether the contract when signed was just and reasonable. They get at least one bite at the apple. FERC itself agrees until today with that proposition, and I'll come back to that. The second simple proposition that I think emerges from reading the statute, and there's no case law that's inconsistent with it, is that nothing in the Mobile Sierra doctrine, even when it's applicable, authorizes the Commission to decree that it is irrelevant whether consumers, whether a contract imposes unjust and unreasonable rates on consumers. We, in our brief, we set forward those propositions, and with regard to the second one, we know that there's no authority for that. On the first one, the at least one bite at the apple, and we think you should have more, but for this case, we only need one because we haven't had it. Until today, FERC never disagreed with that proposition, and I refer you in particular to FERC's Northern Utilities Discussion in 1994, FERC decision, and footnotes 47 and 89 in that decision. And below, in this proceeding itself, the Commission did not say there's never a bite at the apple. What the Commission said was your bite at the apple was our market-based rate predetermination. You think they're saying something else now? Well, I think they are because... Because it did say that if you don't file it at all, you still can apply. Exactly. But you notice that wasn't in their... They did not argue that below. Below, their answer to the one bite at the apple was not... I mean, right, but there's precedent for that proposition. They cited two cases that they claim to date that. That's correct. They cite Lonsdale and Richmond now are cited, both of which in footnotes 47 and 89 of the NU decision from 1994, they explained why, A, those weren't good law in light of recent Supreme Court authority in light of their 1992 policy on filing rates. Even apart from that... Excuse me? Whatever they are, they're not... That's right. And actually, those cases are quite simple. In those cases, a seller made a contract with a buyer. The seller failed to file the contract, never filed it. Then went and said, I'd like to unilaterally change this contract. And said, and I get to do it because I never filed it in the first place. And they said no. Nothing in either one of those cases holds that someone else couldn't come in and challenge that contract for never having a first bite at the apple and that the seller could turn around and say, because I didn't file it, FERC never gets to review whether the rates are just and unreasonable. So the case is hardly, when you look at the fact, it's hardly remarkable at all that the seller shouldn't be able to exploit his own lack of filing. And it's extraordinarily remarkable to try to argue that a seller who failed to file, therefore, gets to insulate forever review of the justice on reasonable rates. So FERC itself explained, those cases, even if they were Ninth Circuit cases, would not create a problem for the reason I just said. In any event, FERC itself has made clear that it agrees that its basic duty, it has to provide at least one opportunity. And its answer was, we're on all fours with our Lockyer decision. And that's a direct quote. They said we're on all fours with Lockyer. So that California was your bite at the apple. When we determined market-based rates, that provided a form of blessing of the justice and reasonableness rates, and they cited their own decision in Lockyer. Now Lockyer's been overturned in part, although not in other parts. And the question is, what is its relevance? And one question I have for you is, in the other case, it was said that it was not relevant because there was no challenge to any market power issue in the forward market. Is that true in this instance? Or does it matter? The challenge here in this case, the theory of the case, and I believe Your Honor actually got it right on the head earlier, was that whether or not the forward market was functioning competitively or properly, indeed, especially if it was, it would simply project into the forward prices what people would expect to have to pay in the spot market. At least up to some period of time. That's correct. Our experts said two to three years is the period of time. And basically the way you get to that way analytically is it takes roughly three to four years to bring on substantial new production capacity, which could be one of the things that would attain. The PERC staff said contracts that had an average two-year duration, which would, which could be slightly longer contracts or slightly shorter depending on their terms. Essentially, the interesting thing is our experts, Dr. Stauff, came out with focusing on exactly the same timeframe as to where this mirror effect would occur in a functioning market. But, so is the answer to the question I asked yes, there is no challenge to market dysfunction or market power in the forward markets, but that doesn't matter. That's correct. We did not. But, see, I understood their argument to be, and I thought it had some force, that Lockyer then becomes largely irrelevant because their argument is that what Lockyer said is that the commission has to continue to at least collect the data they're supposed to be collecting and insist that it be filed and so on because it's a way of continuing to update the market authority question, the market power question. But if there is a market power question, then how is Lockyer relevant? Well, because there is in the derivative sense. A forward market is necessarily a derivative market. It is morally neutral. If tomorrow OPEC took over energy production in the spot market in California and the forward market remained perfectly functioning like the Chicago options market on oil, forward prices would go up even though the forward market is functioning because it's a... But does Lockyer apply to that situation? Yes, it does because when we say... Remember, we... How does Lockyer have you do in that situation? The file... I mean, Lockyer ultimately said that what has to happen is the reports have to be filed and they have to be considered, but where? In the spot market? Yes. Here's why. I mean, if there were an issue about the forward market, I suppose they would have to look there, but... That's what I'm asking. Is there an issue about the forward market? No. We have not made a... We did not make a claim below that the forward market itself was not functioning. Indeed, we pointed out how precisely well it was mirroring and carrying forward the dysfunctional spot expectations. Now, here's how Lockyer bears on that. Remember, Lockyer doesn't... I think we have to be very careful to avoid this sort of bits and pieces of subsidiary rules without going back to what the basic principle is. The basic principle here is FERC is supposed to be doing its job to make sure consumers aren't burdened with unjust and unreasonable rates. That's the basic decision Congress made. FERC has some discretion in how to do it. With market-based rates, they said, well, what we're going to do is we're going to do it by saying if the market's functioning, then a free market will produce just rates. And what Lockyer says is, we're going to let you go with that theory, but you have to make sure the market is functioning. Well, here, and Lockyer remanded because FERC was not paying enough attention to whether it was functioning. In our case, we have a more extreme case than Lockyer because here FERC itself looked at the spot market whose prices directly influenced the forward market and found that the spot market was not functioning. So, you've set up this bizarre rule that a totally dysfunctional market in which market power and market abuses are the worst kind going on and which their own staff finds will therefore directly influence forward prices, they're not going to pay any consideration to whether those are unjust and unreasonable because the forward market is functioning. It's like it turns the forward market into a free pass for extracting... In this case, unlike the other, did FERC also discount saying you had not met your burden of proof with regard to proving that connection? Right. That is what is said in the briefs before... I mean, it's kind of implied in FERC's brief and the sellers come right out and say it. It's odd because what they do is they pull one or two lines out of over 100 pages of FERC decisions and say that those two lines render the other 120 pages entirely irrelevant discussing Mobile Sierra. I would point the court to paragraph 37 of the original decision and paragraphs 69 and 102 of the rehearing petition. One of those is identical to the paragraph that the court read this morning twice in this morning's argument in which FERC made absolutely clear that the way they were handling the staff findings was, and it's correct, they didn't bless the staff findings. Those aren't findings of FERC, but they did not reject them. They simply said they're irrelevant. They would only be relevant if we are operating under a just and reasonable standard of review, which we're not. And that's what they said about the rest of our evidence. It infected the entire proceedings. It wasn't just at the end. I mean, we advanced another proposition that in considering a public interest, it should be relevant to consider whether the seller was itself gaining the market. And so we sought to do discovery into that and were denied. And not this market, the stock market. Well, the stock market, yes. The Reliant case is interesting, which was just before you, because what finally came out in that, but we weren't allowed to get at it, was tapes of the traders talking about how they were going to really rake it in in the forward market by withholding, shutting down their plant falsely in the stock market. That makes everybody think that when you get another 90-degree day next summer, power rates are going to go way up again, and therefore forward prices jump up for next summer. I mean, expressly discussing that nexus between the two markets. Again, though, I don't... Since this whole proceeding does assume the dysfunction of market manipulation in the spot market, what was the necessity to do any more discovery in this case? On that issue, if that's all you were trying to discuss. Well, it's interesting. Here's how the proceeding went. Sellers Council would go up and put on their experts, and their experts would say, Everything in both the spot market and the forward market, any four contracts, is completely explained by market fundamentals. Water goes down, temperature goes up. All spot prices, no improper behavior that affected prices at all in any markets in California. One expert after another go to the stand. I would go up and try to challenge that on cross-examination by wanting to discuss, for example, could we just talk about any withholding of shutting down plants? How about let's talk about dinergy spending in labor trading buildings? The only thing it seems to me that it's ultimately relevant to, and it may be relevant, is that in the end, the agency said that if you could prove bad faith, something, something, that might go to the public interest question, but it appears you weren't really allowed to do that. That's a slightly different problem, but... Yes, but it also affects... It doesn't deal with the just and reasonable. It deals with the way they're applying them. This restraint on us wasn't finally brought to bear on us because before the ALJ could issue a decision, the Commission pulled the case from the ALJ and itself issued a decision, so we don't have a whole set of fact findings like you did in the case this morning. If we're going to go back to the Commission, though, I want to get across the point that the record that we were allowed to put together, because I'm not arguing that this Court should now find that the rates were unjust and unreasonable and that market power affected it. I'm simply saying the Commission needs to decide that case. We should not be limited in our case below on remand by these exact same artificial concepts that all the Court, all the Commission needs to be concerned is conduct specific to the contract, or we will assume there was some abuses, but then you can't discuss or quantify them. Well, if I'm only allowed to assume some abuse and I can't quantify it, how do I cross-examine two professors from Harvard who are up there saying this was all supply and demand? And I go to ask about market power and I'm told, can't because we're assuming it, but then I can't quantify it, and then at the end of the case someone says, you never quantified. It is truly a bizarre record of a proceeding which we never got to the guillotine coming down at the end because the Commission took it and just said everything's irrelevant. But I did want to get across the point that this notion that somehow in this case these contracts at all costs have to be left in violet infected not just the final decision but the entire proceeding, virtually all rulings as we went along, but particularly the discovery and the evidentiary rulings that we've mentioned in our brief. So was there any... You're not claiming that, as I understand it, that FERC should have done anything prospectively with regard to investigating the market authority issue anew before these new contracts were entered? There was really no time. What we're saying is this, is that if you agree that we get at least one bite... When's the bite and what's the bite? That's what I want to know. The bite can't be market-based rate approval because the markets for a while were not functioning. It looked at the markets and they weren't functioning. You could be in inquiry now into the functioning of the forward market at the time that the contracts were entered into, which hasn't happened. Well, again, the functioning of the forward market is not the problem. Well, as influenced by this problem. Exactly. But that's the inquiry that hasn't happened. That seems a much more direct response to what your concern is than the alternative, which would be to do a cost-based just and reasonable standard. Well, let me address that because it's a very good point. FERC tried to set up this market-based regime. It clearly didn't work in California. FERC recognized it. I think it's a mistake to go in and think that the way to necessarily remedy that is to try to construct intellectually what a functioning market is. But isn't that really what Lockyer said? It's okay to have this market-based regime if you do it right? If you monitor it. Because the monitoring would keep it from going off the rails. And you're saying since they didn't monitor at the time or didn't effectively monitor, you can't go back and do it retroactively. It went off the rails. Right. And so now we're back to FERC needs to decide are these contracts, when signed, were not, you know, when signed, were they just and reasonable? And there are different ways to get at that issue. I don't see, it seems to me the most sensible way is to look at the costs to the sellers and a reasonable rate of return. Now, is there anything in this record that addresses that question? Well, there again, we were cut off from getting, we sought their actual costs and we're told we couldn't get those because they weren't relevant because we had a market-based regime. We got some stuff, which is pursuant to a confidentiality order, which we cite in a footnote. So I can't say the precise figures, although sellers and their briefs can address that. Well, just to come back here, let me say that these cost issues, these cost issues are relevant to the market authority question  is ultimately supposed to lead to something similar to a cost-based contract regime. That's right. Therefore, you ought to be able to know what it did. That's right. And that's why, in oral argument for the commission, I charted out, just as an example, the Dinergy contract. I mean, here, one contract that doesn't take all their energy, all their generating capacity, they still have stuff left over to sell to others, in three years, allows them to pay off 100% of all those plants that they bought in California. And then everything is complete gravy on top of that forever. And we suggested that that startling fact is relevant for precisely the reasons Your Honor said, is that how could a functioning market, if you buy the theory of market-based rates, produce a result that is so divergent from cost? Isn't that the theory of laughter, too? Because the only thing that's going to be collected, as I understand the reports, are reports about that. They're not reports about market shares or anything like that. Am I right about that or wrong? What are the reports they're supposed to be in? I don't know the precise date in terms of when the reports are supposed to be in. What are they? What's in them? What's the content of them? Are they contracts with cost figures? What are they? Here's two problems. One is, they ask, what they basically do for market-based rates is they say, tell us what your market share is and whether you have enough to control the market. But that is just one indicia of a functioning market. If that's what's in the reports that were being discussed in Lockyer, not contracts? Well, they're supposed to put in all the trading information as well. And not the actual contracts that they entered into? Well, the contract information is supposed to be filed as well. Informational filings are made as well. And one asks, what was FERC doing with these? I mean, the question in Lockyer, Lockyer only had to go so far as to say, you must at least monitor, and you weren't monitoring. We have a case in which FERC itself has conceded that the markets were entirely dysfunctional. And ironically, I mean, the most amazing thing about this regulatory versus free market environment is that California has now got the worst of both worlds. Because in December, FERC said, California, do these forward contracts and we'll set up this benchmark for assessing their justice and reasonableness after the fact. California rushes in there in a two-month period, sets up these contracts, and then afterwards is told justice and reasonableness is not relevant. You signed the contracts. You didn't reserve a right to have a just and reasonable review. End of the story. We don't need to determine whether consumers are going to be paying on just and unreasonable rates. And there's no case anywhere that says that. I mean, when you read the briefs, what you'll notice is there's a snippet of a piece from one case in one context, like the Lonsdale one, a piece in another one, but no case. No case says that FERC can do what they did here. No case says that a buyer and a seller between themselves can entirely insulate themselves from anybody ever having a look-see at whether the rates are just and reasonable to the extent they affect the public. No case anywhere said that. And that, to affirm FERC, is what this panel would need to hold in the context of the worst market failure in the electricity markets we've ever experienced. All right. Thank you. Thank you. I'd like to go back to the point that was raised this morning and was addressed just now about what is the proper standard here. The question that's been raised, I think probably by you, is how can you read the public interest into a statute that says just and reasonable? And that is a question that is not, I'm sorry to say, original to you. The First Circuit has addressed that question precisely in the Boston-Edison case, 233. But the answer would certainly inform what you then do with the two standards as this case, which is somewhat unique on its facts, evolves. Right. And I think if you go back to Mobile and Sierra, the two cases, and you go back to Northeast Utilities, it says, look, what the Supreme Court did was take out of whole cloth, that was the First Circuit's work, take out of whole cloth and come up with a scheme that makes practical sense in carrying out the purposes of the Act. And the purposes of the Act are two, according to the Supreme Court. One is stability of reasonable amounts of electricity at reasonable prices with price regulation. So you are trying to do those two things in the way that Congress set that up in the FPA was to allow, unlike other statutes that had been before that, allow private parties, because in FERC's world, as you've heard, every number, anybody throws out a number to a court, it's going to be tens, hundreds of millions of dollars in these cases. We don't have really small cases at FERC. That's why we have all these lawyers here because they can afford to pay for lawyers to be here. But seriously, that's what the court says. Look, when you're coming in with supply, you have got to spend a lot of money on generation transmission. If you're the buyer, you may have to spend money to set up a line. In Mobile, that was the issue. It was an industrial buyer, and they had to set up a line. So what you want in that situation is stability of contracts. So the court, just as Harlan says, well, we don't see anything in the Federal, in the Gas Act, and by extension in the Federal Power Act, that says you can abrogate contracts. So then what do you have... There's also nothing that says that at some point the statutory standard doesn't have to be, doesn't have to apply. And the assumption, I assume, in Mobile, although it never comes to the surface because there's no reason for it, is that those rates, before the first contract was entered into, the rates were filed, and the 30-day period expired, and they could have been challenged on a cost basis before the contract was entered into. Is that accurate? No, it's not accurate. Why? Because that is the exact situation that came up in Sierra. If you look at Sierra, and particularly if you look at 353 and 354 of Sierra, what happens there... Now, admittedly, as you recognized this morning, Judge Berzon, we don't know whether the contract was just and reasonable in a cost of service sense when it was entered, but what happened in the facts of Sierra was the company came in and said, look, we're only getting 2.6% return on equity. That's our... Before the contract was entered into. I just said, as you noticed, no one addressed whether it was... Right, they didn't, because the statutory scheme was such that it must have been. True. I don't understand. I'm sorry, I don't understand. I thought the statutory scheme and the way it operated at the time was that the rates had to be filed in order to change the rates to begin with. Correct. And that there was an opportunity for just and reasonable review before it went into effect, i.e., before this contract was signed. And that just would have been an assumption of everybody because that's how the statute was operating in October 1954. Right, and the court does discuss that. You said I was wrong about that, so what am I wrong about? You're wrong about that there was no determination made in the Sierra at the signing of the contract that it was just and reasonable. I didn't say that it was made. I said there was an opportunity for it to be made. There's an opportunity in every case to make it. Market, cost, there's no different opportunity because that's what the statute... Well, here there was no opportunity because you're operating under a market rate system and you're also operating under a system that, as I understand it, only reviews the market rate determination every three years. No, that isn't... You're... We should differentiate between two things. The system that you're talking about is the system under 205, which is when a company comes in with a filing. So, under cost of service, if I'm in a utility, I have to come to the commission and say, I want to set up a new rate. It's going to be whatever, X, and we fight about it. Now, in the market-based rate thing, all I do is I come to the commission and I say, I want to have market-based pricing authority. The commission goes through the analysis under 205 because I came in... Right. And I suggested a rate change and the commission does... But they don't do it again for the next contract, once you have the authority. Once you have the authority because... There's a difference between the situation at the time... So far, both times, I've said something, you've said no, and then we've talked it through and it turns out that my suggestion seems to be correct because, in this instance, at the time of Mobile Sierra, the particular contract would have been submitted first. In this instance, the particular contract does not have to be submitted first. And what has to happen is there has to be a market-rate-based authority issued and that's good for several years so you don't do it over again. Well... So, therefore, unlike at the time of Mobile Sierra, the contract in question, in other words, the rate in the contract is never submitted separately to the agency. But at the time of Mobile Sierra, it would have been, although it's true that the opinions don't talk about it Well, there are several different answers to that. First of all, even in the market-based rate authority, as you know from Lockyer, you have to submit the contract information. The problem in Lockyer, if you go back and read it, is on a quarterly basis, what we require utilities to do is come in with specific information about their contracts. They don't have to do the contracts per se, but they essentially have to tell you what's in them. The problem in Lockyer was people aggregated it for the entire quarter and you're supposed to do it on an individual contract-by-contract basis. Now, because the filing requirements under the Federal Power Act are subject to our discretion, you found and other courts have found that we can set up how the contracts are to be filed. So I would say to you, yes, the contracts under market-based rates are filed with us just as they were in Mobile Sierra's time. It's a different situation. We know from Lockyer that they weren't filed. No. We know from Lockyer that it was filed as an aggregated data. Everybody made quarterly reports. It was filed in a way, said Lockyer, that it appeared that it was difficult to determine, to monitor the market rate authority. I'm not disputing that at all, Jen. What I'm saying is you said that there's no filing requirement. The way I understand Lockyer and the way I think you've been suggesting today is consistent with my understanding. If the filings had been made correctly, this Court has agreed that we have set up a market-based... It weren't for the same period reason here that they weren't there. If we're looking at the question of whether there was... The same period, are we not covering the same time period? Yes, we are. So, was there an opportunity to... Was there any monitoring of the market rate authority question going on before these contracts were entered into? In the specific situation, there was not, because the data were aggregated. There was, however, the same opportunity that there was in Mobile Sierra in what the Court relies on is 206 power. Remember, this case was instituted by a Section 206 complaint. A state commission or the commission on its own motion can come in and institute a complaint and say, are these rates just and reasonable? That could have occurred at any time in this case. It occurred approximately, my understanding, about one year after the contracts were entered, or some period of time. It could have occurred at the same time. There's no... The complaint was filed. You'll see the name of the case below is somebody else. That is a complaint proceeding. That's a 206 proceeding. That's the same thing that in Mobile, the Court said that's the protection... But whatever it was, it would have been after the contracts were signed, right? It's always after the contract. It doesn't have... If they thought... But the position that you're ultimately taking is that once those contracts are signed, you look at it under the public interest standard, not the just and reasonable standard. That's correct, because that is what the Supreme Court has told us. And I might add, if you look at the city of Richmond case, which I'm sure you will, look at the footnote where the Court says the commission went to the just and reasonable standard because the commission said Mobile Sierra doesn't fit with our regulation. It takes away our 206 power to set just and reasonable rates. And the Court said that's wrong. The same thing happened in the Boston Edison case, the first... I'm sorry, the first Northeast Utilities case, where the Court told us that we had conflated the just and reasonable standard with the public interest standard. So, yes, we don't use the just and reasonable standard in a contract situation because the Supreme Court has told us we can't do that. In any other case, and there may be, I just don't know what it is, in which Mobile Sierra public interest standard was applied on top of the market rate-based approach rather than... Where there was a market-based approach operating either as the just and reasonable standard or as a substitute for the just and reasonable standard, however you want to say it, but not the traditional cost-based standard underneath it. I think the market-based rates have been sus and this is the first case that this has arisen. That's what's really unusual about this case. It's unusual in how that we have market-based rates instead of cost-based. We're now pushing the two together and creating something that comes out possibly quite different than when you take the public interest standard and plug it on top of a cost-based approach instead of a market-based approach. Well, I hate to say that there's somewhat circular reasoning there because cost of service, cost of service rate-making, the reason that you set up cost of service rate-making is because you have a monopoly situation and you're trying to get back to what competitive prices would be in the market. The ultimate claim here is that we didn't really have a market operating. We had a market that was being, I understand we had a forward market, but that the forward market was being infected essentially by a dysfunctional stock market and under those circumstances, the contracts were not really being entered into. They were not being entered into such that the assumption of the market-based authority, which was that in the end you're going to get to the same place where the cost-based approach was going to function. That's the argument and FERC seemed to say and we're not going to look at that question. I think I disagree. FERC said absolutely we're going to look at the question. The issue that FERC raised over and over again and I would point just to start out to the initial order in paragraph 8 was whether the dysfunctional spot market affected the forward market, these particular contracts. So, yes, I believe that FERC addressed specifically the question that was raised in the complaint and specifically the issue that you're raising. Now, do we go, we didn't go back to cost of service. That's correct. What we did do, however, was look at, if you recall from the record, that Cal DWR said that we are going to try to get a price of $70 a megawatt hour. That was based on January 2001, the rates that were in effect that had been found to be just and reasonable by the CPUC. This is California setting up its objective of what it thinks is just and reasonable. The commission used the $70 a megawatt, found that the contracts here did not exceed that price over their term and came to that conclusion. So, we didn't do a cost of service, it's correct, but it wasn't like we didn't look at anything. We looked at what Cal DWR, they, as you may recall from those days, they were not, no one in California was FERC's, one of our friends, I'll just put it that way, during that period of time. And they certainly weren't picking a number that would make our job easier. But if you look at the record in this case and what the commission found was that the prices here did not exceed that, that was one of the goals that was reached. Another goal was that Cal DWR, not the commission, Cal DWR said, we want to get a diverse supply, we want to have lower prices in the early years, higher prices in the later years. They got those things. The commission looked at every one of those indicia of what Cal DWR had picked as being presumably just and reasonably, because that's what the California legislature told them in their statute to do, and went through the record, found that those things were met, and therefore there was no harm to third parties. And that is what the public interest. No harm, and they said no harm, no harm sufficient to meet the public interest standard, which was a heightened standard. Just what you said. Exactly. Exactly. I never went back to the just and reasonable standard. There is only one just and reasonable standard under the Act for Contracts, and that is set by the Supreme Court in Mobile, Sierra, and we, if you go back and look at the early cases, you can see that the commission resisted that over and over again and got shot down over and over again, and now we are following what the court has told us. This is what the Supreme Court has told us is the just and reasonable standard under our Act in the situation of these types of contracts. And is it in the statute? No. Obviously, public interest, as Ms. Perry said this morning, is found in 201, not in 205 or 206, but the Supreme Court interpreted the Act and we are required to follow that. If you have no other questions, Mr. Bress is going to speak. Why should a public interest test be more stringent than a just and reasonable test? Well, I think it's for the very reason that the Act was, if you look at the purposes of the Act, that when you have private parties agreeing to a particular type of contract, they want stability, for example, they may have made investment decisions on that, whatever, and so you're going to say, and also the second thing that you have to recall is that under our industries we have very large parties and what the Act does is assess the risk of having either a too high or a too low contract to those parties, rather, in the first instance, rather than the Commission. So if they decide they want to set up a rate that is not just and reasonable, and admittedly all the cases are below, but remember in Sierra they were saying... Here you have a dysfunctional market. You did have a dysfunctional market and that's the question we looked, but what the Commission found, several things on that. The Commission found that, yes, the staff report did find, and the Commission, I don't think, disavowed it, that the one- to two-year contract had an effect, however, most of the contracts... Why isn't that the answer? Well, because I'm going to... Sorry. The Commission found that... Some of the contracts were short-form. Some of them were long-run. At least with regard to the short one, why isn't there an issue? Okay, could I just give my answer and then if you don't like it, give me another question. First, the Commission found, I think it's 624 of the record excerpts, that most of these contracts... What kind of an attitude is that? If you don't like my answer, give me another question. Well, I'm trying to give... That's the mindset of the Commission. No, I'm trying to... I think she was asking me multiple questions. I apologize, Your Honor. I was not trying to be disrespectful. What I was trying to say is, first of all, that the Commission found, and this was the point, I didn't think she was... Maybe she was understanding it. I was misunderstanding her. But the Commission specifically found... Say her honor. Okay. I'm sorry. All right. I'm sorry, Your Honor. I did not mean any disrespect. Well, you've been apparently disrespectful, so go ahead. The Commission found that most of the contracts were for 10 years. So that is the first point. On the second point, at 750 to 751, the Commission said, look, we understand the staff report found that there was a relationship between spot and market, but we think the market fundamentals override that. So they considered it, but they also considered other factors, and those other factors overrode that particular finding. So I don't think they ignored it, the dysfunction in the market. I think that they just looked at it as one factor. But, you know, what I remember, that period, was that they were running around like chicken little, you know, like the sky was falling in. And, you know, the public officials were being blamed and they were desperate to try to ameliorate the situation. And so you weren't dealing with a normal market. You were dealing with a kind of a panic going on. And I remember I was up in San Francisco trying to get a ride back. All the lights are out in the terminal. You know, the planes aren't moving. Why? Oh, we have a blackout now. So you can sit there for two hours. Couldn't even get a warm cup of coffee. And so, I mean, at bottom I can see where you talk about the public interest, but at bottom it's what's just and what's reasonable. And that's what the professor told a student from Syracuse. And that's what Earl Warren tried to tell us. You know, is it just? Is it reasonable? Is it fair? So they had to have some idea, unless they were sleeping somewhere, that, you know, things were not normal. There was an upheaval. And, you know, there's a lot of words here, but that's what it comes down to. Well, the commission was aware of that. You know, people are, companies are making tons and tons of money and enjoying it, while the rest of the people are in panic and suffering. And some folks in plants down in San Berlino County, they'd only work at night because they could get a lower rate. I couldn't turn my washing machine on until late at night. So, I mean, it was just abnormal, that's all. There's no question that it was abnormal. So what was their job? What was the, what was the first job? At the time... ...go back and say, well, you know, the market forces are working and will all straighten itself out in ten years, you know. I don't think, I don't think so. I don't think the commission took that approach at all. I think if you go to the CalPX case in this court, the commission went to the spot market as soon, this is in November. And said, well, you know, you've got to knock that off and we've got to shift some of this to the future market. So, you know, that happened to the future market. Well, all I can say to that point is that... You don't think any games were being played here? There was no finding on this record. I mean, just between us, I won't tell anyone else. Your Honor, I think you heard the name Enron how many times today. Obviously, we're not disabusing the notion that there weren't games being played. But the commission looked at... It's your ultimate position that there was, that it first found that there was no impact other than market fundamental impact of the spot market on the foreign market. And therefore, they did do a market rate authority investigation and found there was no impact. Or it's your position that they didn't have to do that because you were applying a public interest standard. And what they did was sort of a ballpark kind of investigation at a heightened level of inquiry. Which one are you saying? What I'm saying is that they did investigate. I want to take the first part of your answer and the second part because there was a heightened standard if you consider the public interest heightened over the just and reasonable standard. But they looked at all the factors and they didn't find enough... I'm not saying they found no effect of the spot market. What I'm saying is they did not find enough of an effect to override... to require the modifications of the contract under the public interest standard as set in Mobile Sierra. So, in the end, there was never an inquiry parallel to the one that would have been made in the first instance with regard to whether there was a functioning market that would justify a market-based authority as the manner of determining just and reasonable rates. They never made that decision in the way they would have and did when they first granted the authority. Did the individual companies... Did the commission look at the individual companies' market power in 2000 and 2001 to determine if they were exercising market power? Or if they were operating in a functional market that would have justified market-based authority at that time? I think in the prior case you heard about the scores of investigations that we have ongoing as we speak as to those very issues. And, yes, they did consider all those factors here. And, yes, they did take away Enron's market-based power and they have show cause proceedings to look at other... whether to take away market power. Okay. Let's take Enron. My understanding is that the Enron contracts that were entered into in a relevant time period are still... are not going to be the subject of refunds despite finding later that retroactively there was a problem. Is that correct? I don't know, Your Honor. Well, isn't that what this is all about? Isn't that the fundamental underlying problem here? That is whether or not in the refund proceeding the fact that Enron's market rate authority shouldn't have existed at the time they entered into the contracts doesn't matter because that's not what you looked at. That's my understanding. I'm just... I just want to go... You said the refund proceeding. Do you mean this proceeding? This proceeding. This proceeding? This proceeding. I don't think the Commission said it doesn't matter. The Commission said we investigated the matter. We looked at all these factors. In particular, we looked at the DWR's objectives. We found that they... All right, maybe they didn't hit them exactly on the target but they weren't off them enough to require modifications of these contracts. So it isn't that the Commission didn't say we don't have authority to look at this. They said, yes, we have authority. We are going to set up an investigation. We are going to look at them. It's going to be under the mobile Sierra standard but here is all the factors that we looked into. Were any of these contracts with Enron? No, not in this case. In the other case they were. They were. I have enough trouble keeping the facts in this case. But if it had been Enron-like, if it was another agent's company, that's my understanding of what you're saying. If that's not what you're saying, you're saying that if they had come forward in this proceeding with the same evidence they came forward with in the Market Rate Authority proceeding with Enron, you would have considered it under the public interest standard to come to the same conclusion. I don't think that's true. No, I don't think that's what FERC was doing here. If we had done the market-based test is a different test. We looked to determine whether they have market power and they have to come in with a whole bunch of exhibits as to their market power, what's the relevant markets, and things like that. And that's a different analysis. If Enron had a contract, as your question is, if Enron had a contract in this case, would we have not looked at it? Would you have simply said that the public interest requires? We didn't. No. We didn't do that here. In the other case. I'm arguing this, Your Honor. I don't think that's what we did in the other case. I think we said that the public interest is the correct standard under the Act in Mobile Sierra. But in this case, we looked at every single factor that was presented and found that the evidence didn't show that there was an excessive burden on the third parties, which is the standard for the public interest. The third parties are? Those would be the rate payers. The people who are not, the contractual parties, the people, the customers. The customers. Yes. Okay. Thank you. Where are you going? You wound up all your time. Your Honor, if I could please take just some time from you. I'm representing the seller intervenors, the sellers who are responding to the intervenors. I think I've got some very important things to say to this Court with regard to how the statute works. Now, I've got a doctor's appointment on the other side of town. I never expected to be sitting here this long. I'm sorry, Your Honor. A lot of the other cases went over, and I believe that this Court will be invited to start talking and come right to the point. Let me get right to the point, Your Honor. First of all, I'd like to address why there's a heightened standard, why the public interest test is higher, harder to meet than the ordinary test that is applied under 206. I don't believe the Supreme Court made it up out of whole cloth. I don't believe it had the authority to do that. This is just a question of what is just and reasonable, and it can depend on the circumstances. And what is just and reasonable when there is a contract the Supreme Court has held, that to prove something unjust and unreasonable when you have a contract, it requires a higher standard. Now, why is that so? That's one of the questions you've asked, Judge Ferguson. Why would the Court have a higher standard? And the reason is because there's something on the other side of the balance. The reason is that the Supreme Court has recognized that the Federal Power Act cares about not only low prices right now for consumers, but also the integrity of contract for what that means for stability of supply to consumers, not just today but into the future. Now, I'm not just making this up. In Mobile itself, the Supreme Court said that the integrity of contract permits stability of supply arrangements. That's what it was caring about, and it was caring about not just fastly throwing away a contract based on a later determination that the price should have been a little higher or a little lower. In the Memphis case, which came out soon afterwards, the Supreme Court said that the Natural Gas Act, which is parallel, does not only express concern that the public interest test requires protection of consumers from excessive rates, but also concerns the legitimate interests of natural gas companies in whose financial stability the public has a vital stake. Now, in Permian, which followed, the Supreme Court said FERC's responsibility is to protect future as well as present consumer interests and maintain the ability to attract the capital that's necessary to build generation resources. The court recognized that it's important not to lightly throw away contracts on which the suppliers have relied in building new plants or in going out and buying energy to resell, because if you do that, these companies aren't going to do that for consumers. They're not going to come in during a crisis and build new plants in California, which is exactly what happened here. The companies did come in and build long-term plans in reliance on these contracts. Now, is it a heightened standard? The company shut down some plants, too, didn't they? No, Your Honor. During the crisis period, more energy was produced than had been produced in the preceding years. But weren't plants shut down in California? Your Honor, California suffered a diminishment, I mean, a lack of increase of plants. The main problem California had during this time... But weren't plants shut down, like, for maintenance? Oh, for maintenance, of course, Your Honor. That's what I mean. Oh, a lot of them were. Well, no, there is a necessity to keep plants... I mean, some plants, first of all, only run during times of crisis, because they're very expensive to run. There's an answer for everything. Sure. But, Your Honor, in terms of is it a higher standard, the Supreme Court has spoken to that, too. In Permian, the Supreme Court said that the Mobile Sierra Standard contemplates abrogation of these agreements only in circumstances of unequivocal public necessity. In Arklow v. Hall, the Supreme Court said the commission itself lacks affirmative authority, absence of extraordinary circumstances to abrogate contractual arrangements. So, when the First Circuit and the D.C. Circuit have held that you can't conflate the ordinary just and reasonable standard with the public interest standard that applies when contracts are at issue, they weren't just making it up and they weren't getting it wrong. They were getting it from the Supreme Court precedent. Now, the next thing I'd like to address, Judge Berzon, is your question about, well, what about in the first instance? Does there have to be a first bite at the apple? I'd say bite at the apple. Well, I guess that was my colleague's term. Apples, and then we've gotten to apples and oranges. We'll try not to do that. But whether, in other words... We haven't even had lunch yet. I realize that, Your Honor, and my blood sugar is still in the same way. But the question is, when you first signed a contract and you present that contract to the agency in the first instance, you filed the contract, do you have the public interest standard then or do you have the more easy-to-meet just and reasonable standard? And the answer is it's the public interest standard. And the Supreme Court has spoken to that, too. My authority for that is the Supreme Court, fortunately. It's actually Mobile itself, and in Mobile, the Supreme Court at page 342, says that a new rate filed with the commission is, quote, no more a proposed rate than any other rate, all of which are equally subject to commission review. Now, what the court was discussing at that point was the primacy of contract within this scheme, that the rate is actually established... I'll wait for a moment, if you'd like, Your Honor. I'm sorry, go ahead. Okay. That the rate is established between contracting parties subject to FERC's ability to review it as to whether or not it needs to be aggregated in the public interest. And FERC's responsibility there is the same when the contract is presented to it in the first instance or when the contract is challenged later under 206. It's the same standard. And Lansdale speaks to this... I don't understand where you're... Let's go back to page 342. Certainly, Your Honor. It's exactly the opposite. What I understand them to be saying is, as with any other rate change, if people want to enter into a contract, before the rate can go into effect, they have to come to us and file it. We don't have to review it, but we can review it. If we do review it, as I believe the statute has a suspension of going into effect, and you think that they could simply go and enter into the contract at that point, even though there's a proceeding to challenge the rate? There's no doubt in the world, Your Honor, that the parties can enter into a contract. Now, it's subject to refund if the commission suspends the rate and determines that the contract doesn't meet the public interest standard. Okay. Suspend the rate. The rate isn't... The contract's not operative. Well, they can suspend the rate and then allow it to go into effect subject to refund, which they often do, Your Honor. Okay. But they can also suspend the rate, i.e., the contract isn't a good contract. Of course it is. In the course of a contract until there's an opportunity for a rate proceeding, and if there's... Right? I agree with you entirely, Your Honor. And the question is just... That's the opposite, before. No. The question is just which standard applies, Your Honor. Oh. So you think to that question, if there's a contract, it's the public interest standard at that point? I undoubtedly believe so, Your Honor. Do you have authority for that? Yeah. First of all, I believe that this passage where they say a new rate is no more a proposed rate than any other rate, all of which are equally subject to commission review. I think that's what they're saying, but... And they're saying exactly the opposite. It's subject to the Federal Commission Review that there's not a contract. Well... Equally. Equally to what? It's all of which, in other words, any other rate, there's a new rate, and then there's a rate that's been on the books for a while. They're comparing those two, and they're saying that they're equally subject to commission review. Right. Exactly. I agree with that. So whether the rate, the contractual rate has just been filed, or whether the rate has been on file, they're subject to the same review, which is the public interest standard. Now, the case that deals with that most directly is Lansdale. I'd like to go into Lansdale, because I don't think it was actually, with all due respect, described accurately earlier today. Now, the fact of it is described accurately. It was a seller, and the seller and the buyer had a contract that was never filed with the commissioner, and the seller wanted to increase the rate. And the Supreme Court held that the public interest standard should apply to that desire to increase the rate. But if you look at the reasoning that the D.C. Circuit uses in Lansdale, it didn't depend on it being, in that case, the seller that was wanting to change the rate of the contract that had never been filed. What the Supreme Court says is, and they're disagreeing with the commission, because the commission applied the lower JNR standard. The Supreme Court says, The gist of the commission's theory is that a fixed-rate contract has no binding force, at least for regulatory purposes, until it is physically filed with and accepted by the commission. This stands Mobile Sierra Doctrine on its head, for it's the purpose of that doctrine to subordinate the statutory filing mechanism to the broad and familiar dictates of contract law. The court goes on and says at page 1113, Contracts govern the legality of filings, not because the contracts may themselves have been previously filed, but because the regulatory statutes permit the relations between the parties to be established initially by contract. That was the reasoning of the D.C. Circuit in that case. And if there were any doubt about that, It seems you're right about that, and then we can decide whether they're right. Well, of course. But I don't think there's anything in the Supreme Court case. Well, I believe that the Supreme Court, of course, didn't address it. Neither Mobile nor Sierra involved that situation. We can agree on that. Yeah, that's right. But the reasoning of the Supreme Court in Mobile and Sierra, which is that it really is the contract between the parties that governs, and that that's important not to throw that contract away lightly, because contractual stability is important. We agree with that, but we're not dealing in a normal situation. And, you know, the public interest is involved, and what's just and reasonable is involved. I agree with that, Your Honor. So we're not dealing in a properly functioning market. Well, Your Honor, actually we are. In this case, the forward market was properly functioning. There's no dispute on that. No, I mean, the forward market was properly functioning, but wasn't it influenced by the spot market? Well, it was influenced in the following way, Your Honor. It doesn't create any kind of a contract formation problem. How it was influenced is, like any other forward market, what you're willing to pay for something in the future is influenced by what you expect the prices to be in the future. And you can expect, in this case, parties' expected prices to remain high in the future. That expectation was grounded in what was happening in the spot market. It could have been grounded in all sorts of things, but for purposes of this argument, one can assume that it was grounded in some expectation that this function would continue in the future, would exist in the future. Now, the parties chose a rate that they would contract at. The sellers took the risk that, in fact, as the future unfolded, the prices would actually end up being higher than that, perhaps because there was even more dysfunction, perhaps for whatever reason. The buyers took the risk that the rate would actually end up being lower than that. Now, as it turns out, prices went down. Dysfunction or scarcity or what have you, whatever you want to explain it on, didn't end up leading to higher prices in the future. So California paid more, as it turned out, for its future contract than it would have liked to in hindsight. They didn't go up because they got the bad guys. That's why it didn't go up. Well, no, Your Honor. That's, with all due respect, that's not. With all due respect, you think I'm wrong, huh? Well, I don't think that that's in the record. No, that may not be in the record, but you're asking us to take judicial notice about a lot of things. Well, I'm hopefully not, Your Honor. But I'm trying not to ask you to take judicial notice. And when I do, I'll try to say it. Now, does this market-based rates, how does that fit into all of this scheme? That's quite important, as you noted in this case, Judge Berzon. This is the first case which has married Mobile Sierra with market-based rates. Now, how should that work? Now, even if you believe that it was important for FERC to take a look at the contract in the first instance under a lower standard, and I believe that's wrong for the reasons I've stated, but if you believe that that was true, there was every bit as much ability in the market-based world to take the initial look at or before the time of contracting as there is in the cost-based world. In the cost-based world, the contract is filed with the commission, and the commission has the ability, if it wishes, to review it, or else it can just let it go into effect. All right? In the market-based world, it's true that there's a lag time between the time of the initial finding that the markets are working properly. Sometimes, although in the case of SEMCRA, for example, in this case, they had just gotten market-based authorization two months before the contract was signed. But certainly for many of the sellers, there can be a lag time. However, the buyers always have the opportunity, as FERC does to a spontee, if it believes the market isn't functioning properly, if it believes there's dysfunction, to come in and file a 206 complaint to take away the seller's market-based raise authority. You may be right, but I'm not sure FERC agrees with that. Well, I'll certainly leave it to FERC. That's not my understanding of their representations up until now. Your Honor, there's – I am right on that. And they can – there's no doubt about it, Your Honor, that – At least the way the story's been told to us. It seems to be they already got it three years ago, so that's the end of the story. No, at any time – at any time, a party can file a 206 complaint and challenge existing market-based raise authority. I suppose they've done that, okay? We have this big crisis going on, right? And they filed a 206 complaint, and that same day they filed a contract. Then what? Well, they would have challenged – the proceeding under 206 at that point would have been a JNR proceeding to determine whether market-based raise authority should be withdrawn. Would that have influenced the question of whether the contract was looked at under a public interest standard or not? In my view, Your Honor, no. But in my view, Your Honor, it wouldn't – it wouldn't for the following reason. In the cost-based world, traditionally, you go back to Mogul and Sierra. The people who were contracting were monopolists. They were acknowledged monopolists. Your solution is not a solution, though, because your solution is not going to change the question of whether in this crisis situation where they had to do something about getting energy, they couldn't just wait until this 206 proceeding, which can take 20 years or five years or two years or whatever, happened. They'd have to enter into their contract. So they enter into the contract, and that contract now is not going to be looked at with regard to the market-based authority. Actually, Your Honor, they didn't have to enter into it. If they believed that they were right in that – in that filing, that there was market power, or the markets weren't functioning properly and people shouldn't have that authority, they could have bought in the spot markets, and I realize the spot markets were very high. But they could have done that, and as we – But as we now know – as we now know, had they succeeded in proving what they – what they could have proved, they could have gotten that money back in the refund proceedings. There are billions of dollars that are going to be returned in those proceedings. But FERC, with telling everybody to go into the foreign market, would not have been very pleased with that solution. Well, whether it would have been pleased or not, Your Honor, I – you know, I'm trying to deal with sort of what I – what I believe the law actually required of FERC at the time. And market-based rates, you know – well, let me continue a bit. It's – in terms of whether the – It's more time you're going to need. Well, Your Honor, if I'm trying your patience too much, I'm – No, you're not trying – I'm a man of infinite patience. Thank gosh. You know, no. But I've got to – I've got to see somebody, and that person has no patience. Well, he has a patient. That's me. He has plenty of patience. But, you know, we're supposed to – I mean, you like the Supreme Court, you know. When you stand there and the time's up, they push a button and you go down through a trap. Your Honor, I've appeared before the Chief plenty of times, and you're correct. But it's – he's very strict with it. Just one last note, and I'll sit down, Your Honor. The California – That's very helpful. We should have had you up here first. I wish I had had that opportunity, Your Honor. Next time, ask for it. I will. California did try to prove that these contracts exceeded that which a competitive market would have produced. They tried to do it. And they tried to do it. They had one of their experts determine what the cost of the contracts would have been had you built new generation plants based on the cost of those plants. They tried to determine, in other words, what the long-run marginal cost of producing the electricity that was being sold here would be. They had an expert do that. The expert conceded in the end, after his figures had been corrected, because they were off at first, that he could not prove, under that methodology, that the contract prices here, in this case, that DWR achieved – it had significant buying power here – exceeded long-run marginal costs. He couldn't prove it. All right? Not being able to prove that they exceeded long-run marginal costs destroyed their case. Because if you can't prove that the prices are higher than they should be in a perfectly working competitive marketplace, or even in a workably competitive marketplace, you can't meet the public interest standard, which is what they were required to meet in this case. You should answer this with one answer, I suspect. Judge Greger's not here as a doctor, but was he looking at – were there short-term contracts, too? There were short-term, there were medium-term, and there were long-term. But California tried this case in the aggregate, Your Honor. Why is that? That's what explains it. It was their litigation decision to put all of these together and look at them in the aggregate and determine whether the aggregate price of all of them over time – Basically, they tried to prove – to concentrate on the short-term contracts and prove it. Their case wasn't about disaggregating them, Your Honor. Thank you very much for – That's all right. You know, my only regret in life is that I have only but one life to give to the Ninth Circuit. I appreciate it. You made me very happy. Now, you guys want to say something? I mean, I know it's irresistible. Oh, yeah. Well, tell me what very brief is. Two minutes. Well, let's make it a minute and 20 seconds. In terms of the behavior of Mr. Bress's clients, I refer the Court to the record, the investigation of the staff regarding the withholding, the shutting down of the plant, the pleading to criminal misconduct. The suggestion that we blame CWR and California for having signed contracts or having this crisis, it is the obligation of FERC to ensure that wholesale rates are just and reasonable as far as they affect consumers, as is recognized by this Court's preemption decisions prohibiting California, for example, courts from saying anything. All the precedent that was referred to here by either counsel argument, not a single case that they referred to, either by name or even by group or cases, said anything to the effect that it is okay and is somehow consistent with the public interest to allow consumers to bear the burden of unjust and unreasonable rates. Not a single case. We challenge them, and they have not cited any. They can't. There aren't any. Regarding the long-run marginal cost, one piece of our case involved one expert attempting to do a conservative analysis of all the aggregate $70 over 10 years. He concluded, didn't show whether they were or not. That's it. That $70, we're dealing here with contracts that vary between $150 and $250 an hour, as compared to the usual historic price of $30 to $40. Burke says that's all irrelevant. The staff found it was infused. The suggestion that California, quote, unquote, could and should have bought in the spot markets, California was in fact spending over a billion dollars a month in the spot market trying to keep the lights on unsuccessfully. That's why they had no choice but to enter into these long-term contracts, as Burke urged them to do. Unless the Court has any questions? I will not use all of my two minutes. Bless you, my boy. Look, I'll say this because I know the stakes are high here. And these are very complicated cases. And we've had a very thorough discussion. And I think those who were at the podium got a pretty good workout, one you probably won't forget. But I'll say this. If there's anyone here or anyone listening who feels that they have burning information that they need to present, you can go ahead and send us a letter, not to exceed one page, but you can set that up. And if you're going to do that, we'd like to have the letter in here by, what's today, Wednesday? Say by Friday to close the business. All right? Well, you're nice and quiet. Okay, that's it. Listen, we had a very productive day, and the arguments were great.
judges: Browning, Pregerson, Berzon